IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-00209-01-CR-W-BP |
| | ) | |
| ERIC T. RILEY, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Eric T. Riley's Motion to Dismiss (doc #25). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On July 17, 2012, defendant Eric T. Riley was charged in a one-count indictment. The indictment charges that on January 21, 2012, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, possessed a Norinco, Model SKS, 7.62 x 39 caliber rifle and a Jimenez, Model J.S. Nine, 9mm pistol.

On November 22, 2016, an evidentiary hearing was begun on defendant's motion to suppress. The hearing was concluded on January 5, 2017. Defendant Riley was represented by retained counsel James L. Spies. The Government was represented by Assistant United States Attorney Matthew A. Moeder. On November 22, 2016, the Government called Thomas McDonald, a Probation and Parole officer for the State of Missouri, and Deputy U.S. Marshal Larry Duncan as witnesses. On January 5, 2017, the Government called Deputy U.S. Marshal Brandon Redetzke and Detective Troy Schwalm of the Kansas City, Missouri Police Department

as witnesses. The defense called Ebony Nicole Riley and Joyce Anna Bradford, defendant's cousins, to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. As a state probation officer, Thomas McDonald supervised Eric Riley from April 2010 until June 2012. (Tr. I[1] at 5) Defendant Riley was on probation for the felony offenses of trafficking drugs in the second degree out of Jackson County and possession of a controlled substance out of Jackson County. (Tr. I at 7-8)

2. Detective Troy Schwalm testified that he became involved in a narcotics investigation involving Eric Riley on January 12, 2012. (Tr. II[2] at 29) On January 17, 2012, officers obtained a search warrant for defendant Riley's residence, 2803 Elmwood Avenue, Kansas City, Missouri. (Tr. II at 29; Government's Ex. 15)

3. On January 25, 2012, Mr. McDonald filed with the state court a Violation Report for defendant Riley outlining some law violations (drugs and weapons) of which Mr. McDonald had been made aware from a police report he received from the Kansas City Police Street Crimes Unit. (Tr. I at 8) On January 26, 2012, Mr. McDonald attempted to track down defendant Riley by speaking to his cousin, Ebony Riley, with whom he was supposed to be living (during the period of time that Mr. McDonald supervised defendant Riley, defendant Riley had always reported that he was living with Ebony Riley.) (Tr. I at 8, 21) Ms. Riley advised that defendant Riley was no longer living with her, that she had kicked him out because he had been arrested.[3] (Tr. I at 8, 13) Mr. McDonald testified that at that point, he did not have a residence where he could look for defendant Riley and Riley had not reported as directed. (Tr. I at 8) Defendant Riley was required to notify his probation officer within 48 hours of a change of address. (Tr. I at 12) Mr. McDonald attempted to contact defendant Riley twice by phone. (Tr. I at 13) On February 3, 2012, after business hours, defendant Riley returned one call, but did not leave a call-back number and Mr. McDonald testified that he never saw or heard from Riley again. (Tr. I at 13, 32) Mr. McDonald wrote a second Violation Report regarding defendant Riley absconding from supervision. (Tr. I at 8, 12; Government's

---

[1] "Tr. I" refers to the transcript of the hearing held on November 22, 2016.
[2] "Tr. II" refers to the transcript of the hearing held on January 5, 2017.
[3] Ebony Riley testified that she did not tell Mr. McDonald that defendant Riley was no longer living with her. (Tr. II at 65) According to Ebony Riley, defendant Riley continued to live with her at 202 Northwest 27th Court in Blue Springs until July of 2013 when she moved to Raytown, Missouri. (Tr. II at 49-50, 53) In July of 2013, defendant Riley moved in with Joyce Anna Bradford for five or six months. (Tr. II at 73-74, 76)

2

Ex. 3) In February of 2012, Mr. McDonald requested a warrant for defendant Riley. (Tr. I at 8; Government's Ex. 3) Defendant Riley's probation was suspended. (Government's Ex. 5) A Warrant for Arrest was issued on February 21, 2012. (Government's Ex. 6)

      4.     Defendant Riley was arrested on the warrant on July 1, 2012. (Tr. I at 15; Government's Ex. 6) Defendant Riley posted bond and was released. (Tr. I at 15) Joyce Anna Bradford testified that she posted defendant Riley's bond. (Tr. II at 71) Defendant Riley did not make contact with Mr. McDonald. (Tr. I at 15) Defendant Riley did not appear at his probation violation hearing which was set for July 12, 2012. (Tr. I at 16-17; Government's Ex. 8) Another state warrant was issued for defendant Riley's arrest. (Tr. I at 17; Government's Ex. 8) This warrant was withdrawn on February 26, 2015, when defendant Riley's probation expired. (Tr. I at 18; Government's Ex. 9)

      5.     Based on items seized during the search warrant executed at defendant Riley's residence in January 2012, a federal indictment (the charging document in the instant case) was returned against Riley on July 17, 2012. (Tr. II at 30) A federal arrest warrant for defendant Riley was issued on July 17, 2012. (Tr. I at 65; Government's Ex. 12) The warrant was received by the Marshals Service on July 18, 2012. (Tr. I at 65) Deputy Larry Duncan testified that the Kansas City, Missouri Police Department was the lead agency on the case, so the United States Marshals Service did not initiate investigative efforts on the warrant at that time. (Tr. I at 65-66) Deputy Duncan does not know what steps the Kansas City, Missouri Police Department may have taken to have the arrest warrant served on defendant Riley. (Tr. I at 67) Detective Schwalm testified that the Kansas City, Missouri Police Department, and specifically his unit, knew that a federal arrest warrant had been issued for defendant Riley and that they took steps to locate and apprehend Riley before the United States Marshals took over the warrant. (Tr. II at 45)

      6.     The federal warrant was not entered into the NCIC, the national database, by the Kansas City, Missouri Police Department; the U.S. Marshals Service entered the warrant in the database in August 2013. (Tr. II at 31, 37) Records indicate that defendant Riley's name was run through the NCIC database by various law enforcement agencies 29 times between 2012 and when the marshals entered the warrant in August 2013. (Tr. II at 32, 37) There is no way to tell from the records why defendant Riley's name was run through the NCIC; it could have been contact with Riley on the street or because he had other outstanding warrants. (Tr. II at 39-41) However, Detective Schwalm testified that another warrant, the Missouri Probation and Parole warrant, was entered in the NCIC for defendant Riley on August 1, 2012. (Tr. II at 45, 48) If defendant Riley had been stopped on the street and officers saw that he had a state warrant in the NCIC, they would have been required to arrest Riley on that warrant. (Tr. II at 45)

      7.     Deputy Duncan testified that the Kansas City Fugitive Task Force was delegated authority to work on defendant Riley's federal warrant on August 13, 2013.

3

(Tr. I at 40) At that time, Deputy Duncan was assigned to the Kansas City Fugitive Task Force. (Tr. I at 37) The task force was comprised of a couple of different federal agencies paired with detectives from the Kansas City Police Department and the Independence Police Department. (Tr. I at 37) The primary objective of the Kansas City Fugitive Task Force was to apprehend fugitives (people with active arrest warrants) and violent offenders. (Tr. I at 37) Deputy Duncan testified that the task force mainly focused on federal warrants. (Tr. I at 37) While he was with the task force, Deputy Duncan estimated that he located approximately 200 fugitives. (Tr. I at 38-39) Deputy Duncan described the process utilized in locating and apprehending a person with an active warrant as follows:

> Q. … What is the standard overview or procedure that you utilize in locating and apprehending a person with an active warrant with the United States Marshals Services?
>
> A. Usually, when we got assigned a case, we would get as much background information as we could. We'd run them through different public record checks, you know, we would check – pull previous tickets. Usually, if they were on federal probation, we'd talk to the probation officers. We would check utilities if they had active service anywhere. We would check through benefits -- State of Missouri benefits. We'd check to see if they were drawing wages, unemployment. We just try to locate a good frequent address that they used.
>
> Q. Okay. In a normal process of locating and apprehending a person with a warrant, would you do surveillance?
>
> A. Yes, sir.
>
> Q. Would you do residence checks?
>
> A. Yes, sir.
>
> Q. Would you search those residence?
>
> A. Usually, it just, depends on if it's a first party residence or a lot of times we -- I would just do a residence check. I would basically knock on the door, start talking to people. I usually ask for consent to search.

(Tr. I at 38) Deputy Duncan testified that he does not typically document his investigative steps in a report. (Tr. I at 39) The main objective is to locate a body. (Tr. I at 39) If a person is located and arrested, an arrest report is prepared, but the investigative steps leading up to the arrest are not reported. (Tr. I at 39)

       8.     Beginning in August of 2013, in his efforts to locate and apprehend

4

defendant Riley, Deputy Duncan first used a database called CLEAR (Comprehensive Lead Evaluation and Reporting). (Tr. I at 40, 68) Deputy Duncan explained that you run your information through the database and the database provides addresses, properties, vehicles, liens, judgments, everything that is available in a public database. (Tr. I at 40) Defendant Riley's CLEAR report was 71 pages long. (Tr. I at 41) Deputy Duncan also used another public database, LexisNexis, to access different public records for defendant Riley. (Tr. I at 41) Deputy Duncan cross-referenced these two databases to try to find a good address for defendant Riley. (Tr. I at 41) Kansas City Power and Light was contacted to check for a current address for utilities in the name of Eric Riley. (Tr. I at 42) No active utilities came back for defendant Riley. (Tr. I at 42) Previous records checks all came back to the Elmwood area. (Tr. I at 43) The Missouri Department of Social Services was contacted to see if defendant Riley was drawing active benefits or government assistance. (Tr. I at 42-43) He was not. (Tr. I at 43) Deputy Duncan also had a contact with the U.S. Postal Service who could check to see if defendant Riley had a recent address change or an active address. (Tr. I at 42) Deputy Duncan did not receive anything current from the postal service. (Tr. I at 43) The databases utilized by Deputy Duncan did not show any employment wages for defendant Riley in Missouri or Kansas. (Tr. I at 43-44, 78)

     9.     Deputy Duncan testified that he followed up on a couple of addresses in Blue Springs, four on Elmwood in Kansas City, three or four in Kearney, and a couple more in Kansas City in his search for defendant Riley. (Tr. I at 44-45) Both covert surveillance and knock and talks were used at these addresses. (Tr. I at 44) The Elmwood addresses were of particular interest to Deputy Duncan because they popped up on the CLEAR checks and because defendant Riley's state probation officer, Thomas McDonald, provided those addresses to Deputy Duncan.[4] (Tr. I at 46, 52) Deputy Duncan took 15 to 20 other law enforcement officers from the task force with him to do knock and talks at all of the Elmwood addresses at the same time, with officers posted at

---

[4] Addresses were provided to Deputy Duncan in an email from Mr. McDonald on October 3, 2013. (Tr. I at 52; Government's Ex. 10) Although Mr. McDonald did not recall being contacted by Deputy Duncan regarding defendant Riley and McDonald did not have any notes that he had spoken to Duncan, McDonald testified that he has a caseload of somewhere between 75 to 90 probationers/parolees at a time and after he is no longer actively supervising someone, "[t]hey are out of sight, out of mind." (Tr. I at 19, 34) Mr. McDonald testified that if a phone call comes in about someone whom McDonald is no longer actively supervising, he may not make a note of it. (Tr. I at 34) Mr. McDonald further testified that just because he does not have a recollection of communication with the United States Marshals about someone he was no longer actively supervising, does not mean that the communication did not occur. (Tr. I at 33-34) Mr. McDonald believed it likely that he would not have recorded anything in his notes about any contact with Deputy Duncan regarding defendant Riley if the contact occurred after McDonald ceased supervising Riley. (Tr. I at 19) Mr. McDonald was shown and then identified the email he sent to Larry Duncan on October 3, 2013. (Tr. I at 20; Government's Ex. 10) Mr. McDonald agreed that this email indicated that he did have some communication with Deputy Duncan. (Tr. I at 20)

5

the back doors so that no one could run out. (Tr. I at 46-47) Consent to search these residences was given, but defendant Riley was not found at any of these residences. (Tr. I at 47) Deputy Duncan testified that he had contact with some of defendant Riley's family members at the Elmwood addresses. (Tr. I at 47) Deputy Duncan testified that he spoke with defendant Riley's grandmother, Joyce Riley, and two or three other relatives.[5] (Tr. I at 48) Deputy Duncan testified that he spoke with and searched the home of defendant Riley's grandfather, Bernard Toomey, in Kearney, Missouri. (Tr. I at 49, 61) Deputy Duncan interviewed Katrina Reynolds, the mother of defendant Riley's child or children, at her residence in Kansas City, Kansas. (Tr. I at 49-50) Deputy Duncan spoke to Amanda Richie, a possible girlfriend of defendant Riley, over the phone. (Tr. I at 50)

10. In the fall of 2013, Deputy Duncan utilized the Greater Kansas City Crime Stoppers Tips Network in his search for defendant Riley. (Tr. I at 50) Defendant Riley's picture and information was broadcast on the news and also put in a magazine, Kansas City's Most Wanted. (Tr. I at 50)

11. All of Deputy Duncan's investigative efforts to locate defendant Riley took place between August of 2013 and October of 2014. (Tr. I at 51) Deputy Duncan estimated the number of hours he worked on locating defendant Riley to be somewhere between 40 and 80 hours. (Tr. I at 63) In October of 2014, Deputy Duncan was moved from the Kansas City Fugitives Task Force to the Operations Division in the Federal Courthouse. (Tr. I at 51, 68) Deputy Duncan provided the following testimony regarding his investigative efforts in defendant Riley's case:

> Well, I spoke to about every family member I could find. I did residence checks at just about every address I could find he had some connection to. I checked him through every database and it was one of those things that there was not many more places for me to look. So, I would let it cool down and I would follow up from time to time[6] and that was basically my approach at that point that, you know, this guy's kind of -- he's in the wind, he's hard to find. The only help -- the only way I'm going to probably find him is help from a family member.

---

[5] Deputy Duncan testified that he printed the email from Thomas McDonald, kept it in a folder in his vehicle and made handwritten notes on it. (Tr. I at 52-53; Government's Ex. 10) One of the handwritten notes states that Deputy Duncan talked to Ebony Riley and Whitney. (Tr. I at 55; Government's Ex. 10) Deputy Duncan testified that he believes he made these notes when he talked to Ebony Riley and Whitney Riley on the day that the task force officers did knock and talks at the addresses on Elmwood. (Tr. I at 55-56) Ebony Riley testified that she had no contact, in person or over the phone, with Deputy Duncan, anyone with the United States Marshals Service or any other police authority in regards to Eric Riley. (Tr. II at 58)

[6] Deputy Duncan testified that it is a strategic move to lay low and let things cool down. (Tr. I at 51-52) Deputy Duncan wanted defendant Riley to feel comfortable and think, "hey, they're not looking for [me] anymore. I can go back to this address or I can do this or talk to this person." (Tr. I at 51)

(Tr. I at 51) Deputy Duncan was sure that after knocking on the doors of all those addresses and speaking to all those family members, information would get back to defendant Riley. (Tr. I at 51) Deputy Duncan testified that he told defendant Riley's family members that Riley had a federal warrant, that it was not going to go away and that running only makes it worse. (Tr. I at 79) Deputy Duncan gave out his card to defendant Riley's family members and asked them to contact him if they learned of Riley's whereabouts. (Tr. I at 79-80)

      12.    Deputy Brandon Redetzke took over Deputy Duncan's case files when Duncan was moved to the Operations Division. (Tr. II at 3, 15) Deputy Redetzke talked to Deputy Duncan and asked him if there were any investigative leads that he could follow up on and Duncan advised that all investigative leads had ended. (Tr. II at 19) Deputy Redetzke reviewed the file and determined that there were no other investigative angles to pursue. (Tr. II at 21) Deputy Redetzke periodically ran computer checks and checked with different sources to see if anything came up under the name of Eric Riley, but nothing ever came up. (Tr. II at 22) In December of 2015, Deputy Redetzke received a tip through the TIPS Hotline[7] that Eric Riley was wanted by the U.S. Marshals and that he was currently employed at Farmland at 138th and Wyandotte and worked between 7:00 p.m. and 1:00 a.m. (Tr. II at 3-4) Deputy Redetzke went to Farmland and spoke with Human Resources to determine if defendant Riley was currently employed by Farmland. (Tr. II at 3-4) Deputy Redetzke testified that defendant Riley had previously used the alias of Joshua Riley, so he looked through the Human Resources records for either Eric or Joshua Riley. (Tr. II at 4) Deputy Redetzke did not find records for either name. (Tr. II at 4)

      13.    In May of 2016, Deputy Redetzke received a second tip that Eric Riley was working at Farmland. (Tr. II at 5) Deputy Redetzke went back to Farmland and spoke with Human Resources thinking that maybe he had missed something. (Tr. II at 5) Human Resources indicated that there were two contract companies which employed people at Farmland. (Tr. II at 5) Deputy Redetzke contacted the Human Resources departments of those contract companies and found that the companies had photographs of the individuals they employed. (Tr. II at 5) Deputy Redetzke looked for the names Eric or Joshua Riley with negative results. (Tr. II at 5) However, there was someone by the name of Zjhon Riley.[8] (Tr. II at 5) Deputy Redetzke pulled up the photo for Zjhon Riley and it was Eric Riley with a different appearance. (Tr. II at 5-6) The photo of Zjhon Riley was Eric Riley with long dreads; he had changed his appearance.[9] (Tr. II at 6) Deputy Redetzke interviewed defendant Riley's superintendent and confirmed that Riley (whom the superintendent knew as Zjhon Riley) was employed at Farmland. (Tr. II

---

[7] Defendant Riley was in the TIPS network from October 25, 2013, through May 27, 2016. (Tr. II at 4-5)

[8] Ebony Riley testified that Zjhon Riley is her cousin, a different cousin than Eric Riley. (Tr. II at 70)

[9] Ebony Riley testified that defendant Riley started growing dreadlocks at the end of 2011. (Tr. II at 69-70)

7

at 6)  Deputy Redetzke inquired about defendant Riley's work schedule and found out that Riley would be in at approximately 1:00 or 1:30 a.m. the next morning.  (Tr. II at 6-7)

      14.      Deputy Redetzke gathered several Kansas City, Missouri Task Force Officers and U.S. Marshals and set up surveillance of Farmland's employee parking lot.  (Tr. II at 7)  The tips had said that defendant Riley was driving a green '99 Toyota Camry with Kansas license plates.  (Tr. II at 7)  Officers spotted the car at approximately 1:30 a.m.  (Tr. II at 7)  Deputy Redetzke identified defendant Riley using night vision goggles.  (Tr. II at 7)  Officers approached defendant Riley.  (Tr. II at 8)  Deputy Redetzke testified that defendant Riley initially froze and looked around as though he was going to run.  (Tr. II at 8)  However, there were so many officers closing in that he had nowhere to run.  (Tr. II at 8)  Defendant Riley was arrested on the federal warrant on May 19, 2016.  (Tr. II at 8)

      15.      Defendant Riley was not cooperative during the arrest.  (Tr. II at 8)  He would not tell the officers his name, he just said, "You know who I am."  (Tr. II at 8)  Deputy Redetzke testified that defendant Riley was positively identified by his tattoos.  (Tr. II at 8)  Deputy Redetzke further testified that defendant Riley had a very strong odor of marijuana coming from him.  (Tr. II at 8)  Deputy Redetzke transported defendant Riley in Redetzke's car.  (Tr. II at 9)  Deputy Redetzke asked defendant Riley where he was living and Riley replied 2734 Elmwood.  (Tr. II at 9)  Deputy Redetzke told defendant Riley that officers had been to that address several times and they knew he was not living there.  (Tr. II at 9)  Defendant Riley told Deputy Redetzke that he knew officers had gone to that house.  (Tr. II at 9)  Defendant Riley also stated that he had seen that he was wanted by U.S. Marshals on TIPS.  (Tr. II at 9)

### III. DISCUSSION

Defendant Riley seeks to dismiss this case based "upon the delay between issuance of the indictment and the arrest of Mr. Riley in violation of Mr. Riley's Sixth Amendment right to a speedy trial."  (Motion to Dismiss (doc #25) at 1)  Specifically, defendant argues:

      3.      Between July 17, 2012, and May 19, 2016, the Government could have located and arrested Mr. Riley, but failed to do so.  During that time period Mr. Riley was available for apprehension on the indictment.

      4.      During periods of the time frame in question Mr. Riley:

      a.      Lived with his cousin, Ebony Riley, in Blue Springs, Missouri, at the address listed as Mr. Riley's residence with the Missouri Department of Probation and Parole;

> b. Lived with his cousin, Sherry Riley, in Kansas City, Missouri.
>
> c. Lived with his fiancé, Diana Rikai Boyd, in Kansas City, Kansas.
>
> d. Attended school at Penn Valley Community College;
>
> e. Was on parole and being supervised by Thomas McDonald with the Jackson County, Missouri Probation and Parole office.
>
> 5. Although Mr. Riley absconded from parole, U.S. Marshals never contacted Mr. McDonald seeking information about Mr. Riley's official parole address, his last known location, or the names of any family members associated with Mr. Riley.
>
> 6. U.S. Marshals never made contact with Ebony Riley, either looking for Mr. Riley at her residence or seeking information about his last known whereabouts. Ebony Riley received no phone calls or personal visits from U.S. Marshals at any time after the warrant was issued.
>
> 7. U.S. Marshals never made contact with Whitney Riley, Mr. Riley's sister and the occupant of 2803 Elmwood, Kansas City, Missouri – the address relevant to the charges in this case. Whitney Riley received no phone calls or personal visits from U.S. Marshals at any time after the warrant was issued.
>
> 8. At no time was Mr. Riley aware that he was indicted or charged with any federal offense until he was arrested on May 19, 2016.

(Doc #25 at 2-3) Many of the facts asserted by defendant in his motion were not supported by the testimony and evidence presented at the hearing.

In <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972), the United States Supreme Court identified four factors for courts to consider in determining whether post-indictment delay has deprived a defendant of his Sixth Amendment right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.

9

"The first factor, the length of the delay, serves as a triggering device. Unless there is some delay that is presumptively prejudicial, an inquiry into the other factors is unnecessary." United States v. Richards, 707 F.2d 995, 997 (8th Cir. 1983). In Richards, a delay of 35 months between indictment and arrest was deemed presumptively prejudicial and, thus, triggered further inquiry. Id. In defendant Riley's case, there was a delay of 46 months (from July 17, 2012 to May 19, 2016). This delay is deemed presumptively prejudicial and the Court must, therefore, consider the remaining factors.

The second factor, the reason for the delay, is that the government was unable to locate defendant Riley. In United States v. Dowdy, No. 02-0206-01-CR-W-SOW, 2008 WL 4562271 (W.D. Mo. Oct. 10, 2008), the court set forth the following with respect to the second factor:

> The Barker court identified three types of reasons and the varying weights to be assigned to each. Deliberate attempts by the government to delay the trial and hamper the defense are weighed heavily against the government. Barker, 407 U.S. at 531. On the other end of the spectrum, a valid reason for delay provides justification for delay. Id. In the middle of the continuum is government negligence, which "should be weighted less heavily [than bad faith] but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Id.

Dowdy 2008 WL 4562271, at *2.

The Court finds that the government's delay was neither intentional nor negligent. The Court was not presented with much information as to what steps were taken to locate and apprehend defendant Riley from July 17, 2012 (the date of indictment) to August 13, 2013[10] (the

---

[10]While Detective Schwalm testified that the Kansas City, Missouri Police Department, and specifically his unit, knew that a federal arrest warrant had been issued for defendant Riley and that they took steps to locate and apprehend Riley before the United States Marshals took over the warrant (see Fact No. 5), Detective Schwalm did not elaborate on what steps were taken. The Court does note that a Missouri Probation and Parole warrant was entered in the NCIC for defendant Riley on August 1, 2012, and if Riley had been stopped on the street and officers saw that he had a state warrant in the NCIC, they would have been required to arrest Riley on that

10

date that the Kansas City Fugitive Task Force was delegated authority to work on defendant Riley's federal warrant (see Fact 7)). However, after the Kansas City Fugitive Task Force took over in August 2013, significant effort was put forth to locate defendant Riley. Deputy Duncan testified that he entered defendant Riley's federal warrant into the NCIC in August 2013. (See Fact No. 6) Deputy Duncan used databases, such as CLEAR and LexisNexis, to search public records in an attempt to find a good address for defendant Riley. (See Fact No. 8) Deputy Duncan contacted Kansas City Power and Light, the Missouri Department of Social Services and the U.S. Postal Service for information relating to defendant Riley. (See Fact No. 8) Deputy Duncan contacted and received information about defendant Riley from Thomas McDonald, Riley's former probation officer. (See Fact No. 9) Deputy Duncan and other officers conducted both covert surveillance and knock and talks at various addresses that were believed to have some connection to defendant Riley. (See Fact No. 9) Deputy Duncan spoke with various family members of defendant Riley[11] and told them to contact him if they learned of Riley's whereabouts. (See Fact Nos. 9 and 11) Deputy Duncan utilized the Greater Kansas City Crime Stoppers Tips Network in his search for defendant Riley. (See Fact No. 10) When Deputy Redetzke took over Deputy Duncan's case files, he reviewed defendant Riley's file and determined that there were no other investigative angles to pursue. (See Fact No. 12) Deputy Redetzke periodically ran computer checks and checked with different sources to see if anything came up under the name of Eric Riley. (See Fact No. 12) In December of 2015, Deputy Redetzke investigated a tip that he received through the TIPS Hotline that Eric Riley was

---

warrant. (See Fact No. 6)

[11]The Court notes the discrepancy in the testimony between Deputy Duncan and Ebony Riley as to whether Deputy Duncan ever spoke to Ebony Riley. (See Fact No. 9, n.5) The Court need not resolve this discrepancy as it finds Deputy Duncan's testimony credible and sufficient that he spoke with several relatives, regardless of whether one of them was or was not Ebony Riley.

11

employed at Farmland.  (See Fact No. 12)  In May of 2016, Deputy Redetzke received a second tip that Eric Riley was working at Farmland.  (See Fact No. 13)  Deputy Redetzke again investigated the tip and discovered that Eric Riley was working under the alias of Zjhon Riley for a company that contracted employees to work at Farmland.  (See Fact No. 13)  Deputy Redetzke gathered several Kansas City, Missouri Task Force Officers and U.S. Marshals, set up surveillance of Farmland's employee parking lot and arrested defendant Riley.  (See Fact No. 13)  The government has presented a valid reason for the delay.  This factor will not be weighed against the government in the balancing process.

The third factor, the defendant's assertion of his right to a speedy trial, weighs against defendant Riley.  While defendant Riley asserts in his motion that he was not aware that he was indicted or charged with any federal offense until he was arrested on May 19, 2016, the Court finds otherwise.  The Court credits Deputy Redetzke's testimony that while being transported after his arrest, defendant Riley volunteered the statement that he had seen that he was wanted by U.S. Marshals on TIPS.[12]  (See Fact No. 15)  In addition, given the testimony of Ebony Riley and Joyce Anna Bradford (defendant Riley's cousins) that defendant Riley was living with them through the end of 2013 and given the testimony of Deputy Duncan regarding all the family

---

[12]During the hearing, defense counsel requested that the Court "strike any answers that my client would have given [Deputy Redetzke] as being is violation of his Miranda rights."  (Tr. II at 26)  Miranda safeguards come into play whenever a person in custody is subjected to questioning that the police should know is reasonably likely to elicit an incriminating response from the suspect.  See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  The Court finds that although defendant Riley was in custody at the time he made this statement, he was not being subjected to questioning that the police should know is reasonably likely to elicit an incriminating response.  Deputy Redetzke merely asked defendant Riley where he was living and then discounted Riley's answer because law enforcement had checked the address given by Riley.  (See Fact No. 15)  There is no evidence to suggest that defendant Riley's statement that he had seen that he was wanted by U.S. Marshals on TIPS was provided in response to any question posed by law enforcement.

12

members he spoke with (even if he did not speak directly to Ebony Riley or Joyce Anna Bradford), the Court finds it extremely unlikely that defendant Riley did not find out through family members that U.S. Marshals were looking for him. Finally, when defendant Riley was located by the U.S. Marshals, he was using the name Zjhon Riley and had changed his appearance. (See Fact No. 13) The Court finds that defendant Riley had the ability to assert his right to a speedy trial, but chose instead to remain a fugitive.

The fourth factor is prejudice to the defendant. The Barker court set forth the following with respect to this factor:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

Barker v. Wingo, 407 U.S. 514, 532 (1972)(footnote omitted). If the government diligently pursues a defendant, a speedy trial claim will always fail without a showing by the defendant of actual prejudice to his defense. See Doggett v. United States, 505 U.S. 647, 656 (1992); United States v. Erenas-Luna, 560 F.3d 772, 778-79 (8th Cir. 2009); United States v. Brown, 325 F.3d 1032, 1035 (8th Cir.), cert. denied, 539 U.S. 953 (2003); United States v. Dowdy, No. 02-0206-01-CR-W-SOW, 2008 WL 4562271, at *5 (W.D. Mo. Oct. 10, 2008).

Defendant Riley was not incarcerated until his arrest on May 19, 2016, and he asserted in his motion to dismiss that he was not aware that he was indicted or charged with any federal offense until his arrest (even though the facts presented to the Court suggest otherwise), so the

13

first and second interests to be protected are not pertinent to the Court's analysis. With respect to the third interest, to limit the possibility that the defense will be impaired, defendant Riley has not alleged that any witnesses or evidence are missing or that defense witnesses are unable to recall accurately events charged in the indictment. Instead, defendant Riley sets forth the following three assertions of prejudice:

> First, Mr. Riley does not have the ability to co-operate or try to earn a reduction of his sentence, pursuant to sentencing guideline ¶ 5K1.1, because the information he would have offered is now stale.[13] … Second, if Mr. Riley had been timely arrested and prosecuted in this case, he could have served a substantial portion of any sentence he might face. Third, he appears to have placed his life back on a law abiding track by finding a stable residence, a job and avoiding any significant violation of the law for the past four and a half years.

(Motion to Dismiss (doc #25) at 7) The prejudice asserted by defendant Riley does not in any way reflect the possibility that his defense to the pending charges will be impaired. The Court has found that the government diligently pursued defendant Riley from indictment to arrest. As set out above, if the government diligently pursues a defendant from indictment to arrest, a speedy trial claim will always fail without a showing by the defendant of specific prejudice to his defense. Defendant Riley has made no such showing. Thus, the third interest to be protected also plays no part in the Court's analysis. Defendant Riley has shown no prejudice to the interests which the speedy trial right was designed to protect.

Based on the factors discussed above, it is clear that defendant Riley was not denied his constitutional right to a speedy trial. Although 46 months elapsed between indictment and arrest, this factor alone is insufficient, under the facts of this case, to require dismissal.

---

[13] As stated in United States v. Dowdy, No. 02-0206-01-CR-W-SOW, 2008 WL 4562271, at *3 (W.D. Mo. Oct. 10, 2008), "no defendant … is ever entitled to an opportunity to cooperate, much less a motion for downward departure at sentencing. United States v. Fields, 512 F.3d 1009, 1012 (8th Cir. 2008)."

14

## IV.  CONCLUSION

Given the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Riley's Motion to Dismiss (doc #25).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                                  */s/ Sarah W. Hays*
                                                                SARAH W. HAYS
                                                     UNITED STATES MAGISTRATE JUDGE